*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* O. C. SMITH, Minor.

UNPUBLISHED
July 1, 2021

Nos. 355077; 355677
Newaygo Circuit Court
Juvenile Division
LC No. 17-008989-NA

Before: STEPHENS, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals,[1] respondent-father and respondent-mother appeal as of right the trial court's order terminating their respective parental rights to OCS, under MCL 712A.19b(3)(c)(*i*) (failure or inability to rectify conditions of adjudication), and (j) (reasonable likelihood of harm). We affirm.

## I. BACKGROUND

In June 2019, petitioner, the Department of Health and Human Services (DHHS), filed a petition seeking removal of OCS from respondents' care immediately after her birth. Specifically, the petition alleged that mother did not have appropriate housing or employment, that she was a victim of domestic violence, and that she used Norco and methadone, which were not prescribed to her, during her pregnancy. The petition also indicated that mother had four other children, none of whom were currently in her care. A couple of days later, DHHS filed an amended petition with additional allegations. The amended petition reflected that OCS was born positive for opiates and methadone and had withdrawal symptoms. In addition, the amended petition stated that father did not have stable housing. It reflected that he was on probation and had recently been arrested for a probation violation and domestic violence against mother, for which he could face jail time. It alleged that father had "significant criminal history with substance abuse and weapons," including five different arrests from 2013 until 2018. OCS was placed with mother's parents. Respondents

---

[1] This Court consolidated respondent-father's and respondent mother's appeals to advance the efficient administration of the appellate process. *In re OC Smith Minor*, unpublished order of the Court of Appeals, entered December 16, 2020 (Docket Nos. 355077; 355677).

pleaded no contest to the allegations in the petition and the trial court found that some or all of the allegations in the petition were true; it assumed jurisdiction over OCS and ordered respondents to participate in services. However, respondents' participation in services was sporadic. Due to a lack of progress despite efforts toward reunification, on July 22, 2020, the trial court authorized petitioner to file a supplemental petition seeking termination of respondents' respective parental rights. The petition asserted that the parents had failed to properly benefit from services and that termination was in the child's best interests.

The trial court held the termination hearing via Zoom videoconferencing on September 16, 2020. Both mother and father attended the hearing and did not object to the virtual nature of the hearing. At this time, father was incarcerated at the county jail. Amber Whitmire, the foster-care worker assigned to this case, testified that the initial main barriers at the time of adjudication were substance abuse, housing stability, and employment. She stated that respondents were offered several services, such as case management, individual and couples counseling, substance abuse treatment, random drug testing, supervised parenting time, and transportation assistance.

However, Whitmire testified that mother continued to engage in substance abuse. She did not consistently participate in substance abuse treatment or mental health counseling. Mother participated, most of the time, in supervised parenting time before COVID-19. But since the pandemic began and parenting time became virtual, mother's "participation became very sporadic until it stopped happening." Whitmire believed that no in-person visits occurred between mother and OCS since March 2020. Mother had no housing stability or her own independent housing. Moreover, Whitmire highlighted that mother had another child removed from her care "very recently due to testing positive for methamphetamine."

In regard to father, Whitmire testified that he continued to engage in criminal activities and domestic violence. He was either charged or arrested on May 30, 2019, for domestic violence against mother, which Whitmire testified was a huge concern. On June 6, 2020, father was charged with felony assault. He had a history of weapons charges. Whitmire did not know how long he would be sentenced for his pending charges. He had not found stable housing or stable employment. On the basis of father's lack of ability to control his anger that led to the various criminal charges, Whitmire was concerned about OCS being in danger in his care.

Whitmire testified that termination would be in OCS's best interests because there had not been any progress to reunification. OCS was bonded with her grandmother, with whom she had lived since her removal. Two of her half brothers, also mother's children, lived with her; she was bonded and had a good relationship with them. Her newest sister, mother's recently born daughter, was also placed with her.

At the conclusion of the termination hearing, the trial court entered an order terminating respondents' respective parental rights. Mother and father now appeal.

## II. ANALYSIS

### A. DUE PROCESS

In Docket No. 355077, father argues, rather perfunctorily, that the trial court proceedings conducted via Zoom violated his due-process rights because his virtual appearance was no suitable substitute for his consent or the requirement of his actual physical presence, the remote appearance impinged on his right to receive effective assistance through real-time private communication with his attorney, and through the inability to confront witnesses. We disagree.

This Court reviews unpreserved issues in child protective proceedings for plain error affecting substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253 (2008).

> Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings. When plain error has occurred, [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant *or* when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence. [*Id*. at 8-9 (quotation marks and citations omitted; alterations in original.]

"It is well established that parents have a significant interest in the companionship, care, custody, and management of their children. This interest has been characterized as an element of 'liberty' to be protected by due process." *In re Brock*, 422 Mich 101, 109; 499 NW2d 752 (1993). However, [c]hild protective proceedings are not criminal proceedings." *Id*. at 107. "The purpose of child protective proceedings is the protection of the child, while criminal cases focus on the determination of the guilt or innocence of the defendant." *Id*. "Although the Sixth Amendment of the United States Constitution provides" that a criminal defendant shall enjoy the right to confront the witnesses against him, the Michigan Supreme Court has concluded "that the Sixth Amendment right of confrontation does not apply" in child protective proceedings. *Id*. at 108. Moreover, "[a]lthough due process often requires confrontation and cross-examination, these are not absolute requirements." *Id*. at 109 (citation omitted).

In regard to the use of technology, such as videoconferencing, to conduct judicial proceedings, MCR 6.006(D) provides that "[t]he use of telephonic, voice, video conferencing, or two-way interactive video technology, must be in accordance with any requirements and guidelines established by the State Court Administrative Office, and all proceedings at which such technology is used must be recorded verbatim by the court." Specifically, as pertinent to this case, on April 7, 2020, in response to the COVID-19 pandemic, our Supreme Court entered Administrative Order No. 2020-6. That order provides, in relevant part, as follows:

> Although our highest priority during this crisis is for courts to continue to be vigilant and protect against further spread of the coronavirus, we must also continue to ensure that our courts operate as efficiently and effectively as possible under the circumstances, continue to ensure timely hearing and disposition of essential matters, and make our best efforts to provide timely justice in all other matters. The purpose of the order is to empower our courts and judges to meet this

challenge by allowing them to use innovative ways to conduct court business remotely, including best practices as identified by the State Court Administrative Office.

On order of the Court, pursuant to 1963 Const, Art VI, Sec 4, which provides for the Supreme Court's general superintending control over all state courts, the Court authorizes judicial officers to conduct proceedings remotely (whether physically present in the courtroom or elsewhere) using two-way interactive videoconferencing technology or other remote participation tools under the following conditions:

• any such procedures must be consistent with a party's Constitutional rights;

• the procedure must enable confidential communication between a party and the party's counsel;

• access to the proceeding must be provided to the public either during the proceeding or immediately after via access to a video recording of the proceeding, unless the proceeding is closed or access would otherwise be limited by statute or rule;

• the procedure must enable the person conducting or administering the procedure to create a recording sufficient to enable a transcript to be produced subsequent to the activity.

While this order is in effect, and consistent with its provisions, all judges in Michigan are required to make a good faith effort to conduct proceedings remotely whenever possible. Although adjournments are permitted when necessary, courts are directed to implement measures to ensure all matters may proceed as expeditiously as possible under the circumstances, given the particular public health conditions in each locality and the technology resources and staffing situations in place at each court. The Michigan Judicial Institute will continue to provide instruction and other training materials on procedures to conduct remote hearings. Courts should also consult with their regional administrators in working toward this goal.

On June 26, 2020, our Supreme Court ordered the continued use of remote participation technology, by video or telephone, "as much as possible to reduce any backlog and to dispose of new cases efficiently and safely." Supreme Court Administrative Order No. 2020-19 (2020).

At the outset, father waived review of his claim that conducting the termination hearing via Zoom violated his due-process rights. "Waiver is the intentional relinquishment or abandonment of a known right, as distinct from a litigant's failure to timely assert that right (forfeiture)." *In re Ferranti*, 504 Mich 1, 33; 934 NW2d 610 (2019) (quotation marks and citation omitted). At the April 29, 2020 statutory review and permanency planning hearing, held remotely, the referee stated, "We're doing this matter via Zoom due to COVID-19 restrictions, obviously.

-4-

Is there any objection to that at this time?" The lawyer-guardian ad litem and the prosecutor responded in the negative. Defense counsel did not respond. At the July 22, 2020 statutory review hearing, the referee again asked if there were any objections to the hearing being conducted via Zoom because of pandemic restrictions. This time, defense counsel responded "no." Defense counsel also responded "no" to the same question when it was posed at the termination of parental rights hearing. As a result, father has waived appellate review of this claim. See *id*.

At any rate, the trial court's decision to conduct the termination hearing via Zoom did not constitute plain error affecting father's substantial rights. *In re Utrera*, 281 Mich App at 8.

"The fundamental requisite of due process of law is the opportunity to be heard. The hearing must be at a meaningful time and in a meaningful manner." *In re Rood*, 483 Mich 73, 92; 763 NW2d 587 (2009) (quotation marks and citation omitted). Further, "[d]ue process requires fundamental fairness, which is determined in a particular situation first by considering any relevant precedents and then by assessing the several interests that are at stake." *Id*. (quotation marks and citation omitted). "In Michigan, procedures to ensure due process to a parent facing removal of his child from the home or termination of his parental rights are set forth by statute, court rule, [DHHS] policies and procedures, and various federal laws . . . ." *Id*. at 93. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *In re Brock*, 422 Mich at 111 (quotation marks and citation omitted; alteration in original).

In this case, it is undisputed that the trial court held proceedings in this case via Zoom in compliance with applicable Michigan Supreme Court Administrative Orders issued as a result of the COVID-19 pandemic. At the time of the termination hearing, father was incarcerated and apparently aware of the hearing and that it would be held via Zoom. He did not object to the proceeding being conducted virtually. Although the nature of virtual proceedings is unavoidably different than an in-person hearing, father fails to specify how the Zoom hearing affected the assistance provided by his counsel or his ability to confront witnesses.[2] In other words, he has not shown that holding the hearing by way of Zoom instead of in person affected the outcome. *In re Utrea*, 281 Mich App at 9. Both respondents had the opportunity to present evidence and question witnesses; however, they declined to challenge the evidence presented by the DHHS. There is no evidence that this decision was based solely on the fact that the hearing was held virtually as opposed to being in person. Moreover, as will be discussed later, the trial court did not err by finding that at least one statutory ground supported termination and that termination was in the child's best interests. As a result, father was not denied the opportunity to attend the hearing and be heard, nor did the virtual hearing result in fundamental unfairness. Accordingly, father has not shown that the trial court conducting the termination hearing via Zoom violated his due-process rights. See *In re Rood*, 483 Mich at 92. See also *In re Sanborn*, __ Mich App __, __; __ NW2d __ (2021) (Docket Nos. 354915, 354916); slip op at 7-8 (holding that delays in holding hearings

---

[2] Defendant has not developed an ineffective assistance of counsel argument other than to say he was not able to discuss the case with his lawyer in real-time during the proceeding, although he also admits that "these violations might have been avoided through the use of a zoom break-out room," and he makes no allegation that he sought to do so and was denied, or that any moment arose in which such consultation was necessary.

and filing termination petition in child protective proceeding because of COVID-19-related restrictions did not result in the violation of the respondent's due-process rights).

## B. REASONABLE EFFORTS

In Docket No. 355677, mother argues that DHHS failed to make reasonable efforts to reunify the family in light of the unique circumstances of the COVID-19 pandemic. We disagree.

This Court reviews a trial court's decision regarding reasonable efforts for clear error. *In re Fried*, 266 Mich App 535, 542-543; 702 NW2d 192 (2005). "A finding is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010) (quotation marks, citation, and alteration omitted). However, unpreserved issues are reviewed for plain error affecting substantial rights. *In re Utrera*, 281 Mich App at 8.

Generally, the DHHS "has an affirmative duty to make reasonable efforts to reunify a family before seeking termination of parental rights." *In re Hicks*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c), and MCL 712A.19a(2). "As part of these reasonable efforts, the Department must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *In re Hicks*, 500 Mich at 85-86. The case service plan must include, in relevant part, a schedule of services "to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement." MCL 712A.18f(3)(d); see also *In re Mason*, 486 Mich at 156. The parent should be given a reasonable time to make changes and benefit from services before termination of parental rights. See *In re Mason*, 486 Mich at 159.

The record reflects that the DHHS prepared case service plans before each review hearing. At each hearing, a DHHS employee detailed the services that the DHHS provided to mother. Although mother is correct that drug screens stopped during the pandemic, the record reflects that she refused drug screens when they were still ongoing. She also tested positive for hydrocodone and gave birth to a child who tested positive for methamphetamine during this case. She minimally engaged in counseling. In fact, DHHS employees testified numerous times that mother participated in case management services much more than she participated with counseling. And although parenting-time visitations went well at first, they eventually became almost nonexistent. When restrictions lifted and the child's placement offered in-person visits, mother canceled. Ultimately, the record shows that mother's failure to fully participate in services was not the result of COVID-19 restrictions. See *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012) (stating that when the DHHS has the responsibility to make reasonable efforts, the respondent has a "commensurate responsibility" to participate in the offered services.)

Accordingly, mother fails to demonstrate that the trial court committed clear error when it found that reasonable efforts had been made to reunify the family.

## C. STATUTORY GROUNDS

Father challenges the trial court's findings that statutory grounds existed for termination of his parental rights. We disagree. Although mother does not explicitly contest this question, we have reviewed the trial court's findings as to mother as well, and proceed to discuss both parents.

"This Court reviews for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Fried*, 266 Mich App 541 (quotation marks and citation omitted). "When reviewing the trial court's findings of fact, this Court accords deference to the special opportunity of the trial court to judge the credibility of the witnesses." *Id*.

Mother and father's parental rights were terminated pursuant to MCL 712A.19b(3)(c)(*i*) and (j). Because we conclude that the trial court did not clearly err as to subsection (j), we need not address subsection (c)(*i*). See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).

Termination of parental rights under MCL 712A.19b(3)(j) is proper when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." See also *In re Gonzalez/Martinez*, 310 Mich App 426, 433-434; 871 NW2d 868 (2015). This statutory factor considers not only the harm that may result from the parent's conduct toward the child, but also harm that might reasonably result from the parent's conduct around the child, such as exposing a child to individuals with criminal backgrounds who might exploit the children or otherwise place them at risk. See *In re White*, 303 Mich App 701, 712; 846 NW2d 61 (2014). A parent's "lengthy period of instability" stemming from mental health issues, combined with a present and "continuing lack of judgment, insight, and empathy" for a child is also relevant to this statutory ground. *In re Utrera*, 281 Mich App at 25. Harm may also include the prospect that the parent's behavior would negatively influence the children. See *In re Olive/Metts Minors*, 297 Mich App 35, 41; 823 NW2d 144 (2012).

As to father, there was clear and convincing evidence that OCS faced a reasonable likelihood of harm if returned to his care. The record reflects that he continued to accrue criminal convictions and charges throughout the course of his case, including a charge for domestic violence against mother. He was incarcerated at the time of termination. He continued to lack adequate or stable housing. Before drug screening stopped because of the pandemic, he once tested positive for oxycodone, which was not prescribed to him. And he stopped participating in random drug screens well before the pandemic began.

As to mother, there was also clear and convincing evidence that OCS faced a reasonable likelihood of harm if returned to her care. The record reflects that mother struggled with substance abuse and mental health issues over several years. During her case, mother gave birth to a child who tested positive for methamphetamine. Although offered substance abuse services to rectify these barriers, mother did not benefit from those services. Mother continued in a relationship (with father) that involved domestic-violence charges and rumors of other domestic-violence incidents. And she continued to lack stable and adequate housing. As a result, the trial court could properly find that the children were reasonably likely to be harmed if returned to the care of either mother or father. See *id*. See also *In re White*, 303 Mich App at 713 (concluding that the trial court did

not clearly err by finding support to terminate parental rights pursuant to MCL 712A.19b(3)(j) given the respondent's failure to benefit from her case-service plan and the likelihood that her behavior would put her children at a risk of harm).

## D. BEST INTERESTS

Both mother and father argue that the trial court clearly erred when it found that termination was in OCS's best interests. We disagree.

"Even if the trial court finds that the Department has established a ground for termination by clear and convincing evidence, it cannot terminate the parent's parental rights unless it also finds by a preponderance of the evidence that termination is in the best interests of the children." *In re Gonzalez/Martinez*, 310 Mich App at 434. "In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016) (quotation marks and citation omitted). "[T]he child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home," are all factors for the court to consider when deciding whether termination is in the best interests of the child. *In re White*, 303 Mich App at 713 (quotation marks and citation omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the child[]'s well-being while in care, and the possibility of adoption." *Id*. at 714. The focus is on the best interests of the child, rather than the parent. *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

In *Olive/Metts*, 297 Mich App at 43, this Court explained what a trial court must consider if a child is placed with a relative. Generally, a child's placement with relatives weighs against termination. *Id*. If a child is in the care of relatives at the time of the termination hearing, this is an explicit factor that a trial court must consider when making its termination decision. *Id*. However, termination is still allowed "in lieu of placement with relatives if [the trial court] finds that termination is in the child's best interests." *Id*. (quotation marks and citation omitted). "A trial court's failure to explicitly address whether termination is appropriate in light of the children's placement with relatives renders the factual record inadequate to make a best-interest determination and requires reversal." *Id*.

In these cases, the trial court found that termination was in OCS's best interests, reasoning that she was doing well with, and bonded to, her relative caregiver; that she was bonded to her siblings; and that this placement was likely to be permanent. Moreover, the record reflects that mother and father did not have stable housing and that the DHHS was concerned that OCS would be exposed to homelessness if returned to respondents' care. Additionally, father had a history of domestic violence against mother. The record shows that mother and father did not consistently attend counseling. Further, father did not seem fully invested in counseling services. Respondents' visitations also stopped before termination occurred. Finally, OCS's placement was willing to adopt her, as it had done with one of her siblings. Therefore, a preponderance of the evidence existed to find that termination was in OCS's best interests. See *Gonzalez/Martinez*, 310 Mich App at 434.

Father argues that his having a continued legal relationship poses no threat to OCS's ability to reside with her half siblings. Father maintains that he is committed to remaining in contact with OCS and appropriately parenting her. He argues that termination was contrary to OCS's best interests because OCS was bonded to him and, on the basis of the record, "there is good likelihood she can be returned to her father safely." He contrasts his situation to mother's, noting that he has no history of neglecting children. However, again, the record supports a finding that father himself posed a threat to OCS. He continued to accrue convictions and charges for violent actions during the course of the case. He made no progress in rectifying his housing barrier by acquiring and maintaining adequate and appropriate housing. At the time of termination, he was in jail and awaiting sentencing.

Mother argues that the caseworkers, the lawyer-guardian ad litem, and the trial court all failed to address the proposition that placement with a relative weighs against termination. Mother argues that termination is confusing because some of her children living with grandmother are in a guardianship with grandmother, while her parental rights have been terminated as to others. Mother notes that OCS was just over a year old and that mother had 17 years of OCS's life to overcome her barriers and become a fit parent, which could happen if the court had granted a guardianship instead of termination. Mother cites MCL 712A.19a(9)(c), which provides that "if the court determines that it is in the child's best interests," it may "appoint a guardian for the child, which guardianship may continue until the child is emancipated." She also cites MCL 712A.19a(10), which provides that "[a] guardian appointed under subsection (9)(c) has all of the powers and duties under section 5215 of the estates and protected individuals code." And she cites MCL 712A.19a(13), which provides as follows;

> The court's jurisdiction over a guardianship created under this section must continue until released by court order. The court shall review a guardianship created under this section annually and may conduct additional reviews as the court considers necessary. The court may order the department or a court employee to conduct an investigation and file a written report of the investigation.

Mother's argument is misplaced. In regard to OCS's age, mother's assertion appears to be that she should be given some indeterminate amount of time, perhaps until OCS is 18 years old, to rectify her barriers, and that the law allows such a long-term guardianship to occur. But MCL 712A.19a(9)(c) provides that the trial court may appoint a guardian if it determines that such an action is in the child's best interests. In OCS's case, the trial court determined that termination and adoption was in her best interests, a finding that the DHHS and the lawyer-guardian ad litem supported. This determination was supported by evidence of mother's case history. At the time of termination, mother had six children, all of whom had been removed from her care. The oldest was a teenager and was in a guardianship with the grandmother. Two other children were in the sole custody of their father. This history suggests that mother's ability to parent had not improved over a number of years. Moreover, OCS was likely to be adopted by her placement, giving her the same adoptive parents as at least one of her half siblings.

We are also satisfied that the trial court expressly considered that OCS was placed with a relative at the time of termination. See *In re Olive/Metts*, 297 Mich App at 43. The trial court, the lawyer-guardian ad litem, and the DHHS agreed that OCS's bond to her grandmother, her long

stay with her grandmother, her grandmother's willingness to adopt her, and her ability to continue to be raised in the same household as a number of her half siblings weighed in favor of termination.

       Affirmed.


                         /s/ Cynthia Diane Stephens
                         /s/ Jane M. Beckering
                         /s/ Colleen A. O'Brien